IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PRECISION IBC, INC., | : | |
| Plaintiff, | : | |
| v. | : | CA 1:12-00671-C |
| WAGNER INK, INC., ALBERT WAGNER, *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM OPINION AND ORDER

The parties have consented to the exercise of jurisdiction by the undersigned Magistrate Judge for all proceedings in this Court pursuant to 28 U.S.C. § 636(c).   And presently before the Court is a motion to dismiss for lack of personal jurisdiction filed by both named defendants, Wagner Ink, Inc. and Albert Wagner (also referred to collectively as, simply, the defendants), which also requests, in the alternative, the transfer of this action to the United States District Court for the Eastern District of New York.   (Doc. 14.)   The plaintiff, Precision, has filed an opposition (Doc. 17), and the defendants have filed a reply (Docs. 21, 24-1).   As explained fully below, the Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction is due to be **DENIED** as to Defendant Wagner Ink, Inc. and **GRANTED** as to Defendant Albert Wagner.   The alternative motion to transfer venue pursuant to 28 U.S.C. § 1404(a) is due to be **DENIED**.

## I.        Precision's Motions to Strike.

First, however, the Court must address Precision's motions requesting the Court strike (1) Albert Wagner's affidavit in support of the motion to dismiss/transfer venue (Doc. 14-2) because that "affidavit is replete with improper qualifications that are

insufficient to establish the existence of a 'fact' based upon personal knowledge[]" (*see* Doc. 18); (2) the defendants' original reply brief (Doc. 21) because it is twice the length allowed by Local Rule 7.1(b) and presents new arguments not raised in the defendants' principal brief (*see* Doc. 23); and (3) Albert Wagner's amended affidavit (Doc. 21-1), which Precision asserts contradicts his previous affidavit (*see* Doc. 23).

While the Court will exercise its discretion to consider Precision's evidentiary objections to Wagner's affidavits "on an ongoing basis herein, and only to the extent necessary to resolve the pending" motion, *King v. Alabama Dep't of Pub. Health*, Civil Action No. 09–0503–WS–C, 2010 WL 3522381, at *1 n.1 (S.D. Ala. Sept. 2, 2010),[1] it should be noted, at the outset, that Precision's continued efforts to strike Wagner's affidavit(s), after Wagner filed an amended affidavit, is a waste of the Court's and the parties' resources.

First, as one court noted, in the context of summary judgment, "[i]t is the function of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement." *Rangel v. Schmidt*, Cause No. 2:09–CV–071, 2011 WL 5570691, at *4 (N.D. Ind. Nov. 16, 2011) (denying motion to strike certain paragraphs in a plaintiff's "Clarified Affidavit"—which, in part, asserted the affidavit contained "speculation that [fell] outside [plaintiff's] personal knowledge"—noting, "Motions to strike are heavily

---

[1]      In following this approach where two motions to strike took "issue with literally dozens of factual representations in plaintiff's brief and supporting affidavits[,]" Chief Judge Steele chose not be "becom[e] mired in ancillary evidentiary objections at the outset."   *Id.*

disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party.    This Court can give Rangel's Clarified Affidavit the credit to which it is due, without the need to employ a motion to strike.    The Court is able to sift through the evidence and to consider each piece under the applicable federal rules . . . .") (citations omitted); *compare id., with Serrano v. Cablevision Sys. Corp.,* 863 F. Supp. 2d 157, 163 (E.D.N.Y. 2012) (noting, for example, a court may choose to either strike or "simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible") (citations omitted).

Moreover, courts, rightly, frown upon continued efforts to strike affidavits where an affiant files a second affidavit "indicating that the information contained within [the initial] affidavit is based on his personal knowledge."    *United Steelworkers of Am., AFL-CIO-CLC v. Hempt Bros., Inc.,* 866 F. Supp. 164, 166 (M.D. Pa. 1994) (finding such objections to be "not persuasive")[2]; *cf. Whitehead v. Pilgrim's Pride Corp.,* No. Civ.A. 05-1323-A, 2006 WL 220834, at *2 (W.D. La. Jan. 27, 2006) ("We are perplexed by two things surrounding Defendants' request.    First, Defendants failed to cite any authority in which a court refused to consider an affidavit if the declarant appeared to have personal knowledge and to be competent, but failed to make such affirmative statements*.   **Second, we are surprised Plaintiffs did not solve the problem, <u>as is often done</u>, by filing a supplemental affidavit following Defendant's Motion to Strike, in***

---

[2]    There the affiant's original affidavit (like Wagner's original affidavit in part) improperly indicated that it was based on his "knowledge, information, and belief."    *Id.*    The affiant "filed a supplemental affidavit indicating that the information contained within the affidavit [was] based on his personal knowledge[,]" and counsel further indicated that, although the use of such language was improper, "they understood that the information contained [in the original affidavit] was based on [the affiant's] personal knowledge."    *Id.*

3

*which Plaintiffs would have added language to inform us that Mr. Whitehead was competent and had personal knowledge, if those things are in fact true.*") (emphasis added).

Accordingly, while the Court will "review carefully" the statements in Wagner's affidavit, as amended, to ensure that such statements are based on Wagner's personal knowledge (as it would without the benefit of motions to strike), Precision's motions to strike as to the affidavits are **DENIED** as unnecessary.   As to the defendants' allegedly improper initial reply brief, the Court **GRANTS** their motion for leave (Doc. 24) to file a substitute, conforming reply brief (Doc. 24-1), and will only consider the arguments they present therein.   *Cf. King*, 2010 WL 3522381, at *1 n.1.   Therefore, Precision's first motion to strike (Doc. 18) is **DENIED**; Precision's second motion to strike (Doc. 23) is **GRANTED IN PART and DENIED IN PART**; and the defendants' original reply brief (Doc. 21) is **STRICKEN**.

## II.      Relevant Background.[3]

Precision is a Delaware corporation that maintains its principal place of business in Alabama (Doc. 1, compl., ¶ 1), whereas New York is the domicile of Defendant Albert Wagner and where Defendant Wagner Ink is incorporated and maintains its principal place of business (*compare id.*, ¶¶ 2, 3, *with* Doc. 14-2, Wagner Aff., ¶¶ 1, 2). "Precision is in the business of selling and leasing intermediate bulk containers[, also

---

[3]      Because the Rule 12(b)(2) motion is before the Court without an evidentiary hearing, Precision need only establish a *prima facie case* of jurisdiction over Wagner Ink and Albert Wagner.   *See LaSalle Bank N.A. v. Mobile Hotel Props., LLC*, 274 F. Supp. 2d 1293, 1296 (S.D. Ala. 2003); *accord HomeBingo Network, Inc. v. Chayevsky*, 428 F. Supp. 2d 1232, 1240-41 (S.D. Ala. 2006) (citing, *inter alia, Meier ex rel. Meier v. Sun Int'l Hotels*, Ltd., 288 F.3d 1264, 1269 (11th Cir. 2002)).   As such, the Court will "take all allegations of the complaint that the defendant[s] do[] not contest as true, and, where the parties' affidavits conflict, the court must construe all reasonable inferences in favor of the plaintiff."   *LaSalle Bank*, 274 F. Supp. 2d at 1296; *accord United States Sec. & Exch. Comm'n v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997).

4

referred to as "tanks,"] designed to store and transport hazardous and sensitive materials like petroleum, chemicals, pharmaceuticals, and food products" (Doc. 17-1, Wolfe Aff., ¶ 2), and, during the relevant time, Wagner Ink "was a manufacturer and distributor of ink for use in commercial printing, generally for use by printing shops" (Doc. 14-2, ¶ 3).[4]

Wagner Ink contacted Precision in January 2009 to inquire about leasing two tanks.   (Doc. 17-1, ¶ 3.)   Thereafter, over the span of more than two years, Precision and Wagner Ink entered into three separate lease-purchase agreements: in January 2009, for the lease of two tanks; in March 2010, for the lease of twelve tanks; and in March 2011, for the lease of fifteen tanks.   (Doc. 1, ¶¶ 11-13.)   As with the first lease-purchase agreement, Wagner Ink contacted Precision to inquire about entering the second and third agreements.   (Doc. 17-1, ¶¶ 4, 6.)    All three agreements, which "were identical except for the quantity of Tanks, their respective execution dates, and the rental price per month for each Tank" (Doc. 1, ¶ 14), required, among other things, that the monthly rental fee be paid to Precision at its principal office in Fairhope, Alabama and that Alabama law governed (*id.*, ¶¶ 15, 16).

According to Precision, Wagner Ink was "frequently late making its monthly rental payments" under the first agreement.   (Doc. 17-1, ¶ 3.)   Precision thus required Wagner Ink "to pay the past due rent under the first agreement before [it] would consider leasing Wagner Ink additional tanks.   Wagner Ink paid the past due amount to Precision in Fairhope and assured Precision that going forward [it] would timely pay

---

[4]    The complaint also asserts claims against twelve fictitious party defendants—unnamed persons or business entities that either purchased the subject tanks from Wagner Ink and/or Albert Wagner, or were creditors of Wagner Ink and/or Albert Wagner, or are currently in possession of the subject tanks.   (Doc. 1, ¶¶ 4, 5, 6.)

5

the monthly rental fees in accordance with the agreements."   (*Id.*, ¶ 4.)   But, according to Precision, late payments persisted, and, like before, Precision required payment of past due rental amounts owed pursuant to the first two agreements and assurance that payments would be timely going forward before entering into the third lease-payment agreement.   (*Id.*, ¶ 6.)   After execution of the third agreement, Precision alleges, Wagner Ink sent it a worthless check and ceased paying Precision the monthly rental fees in violation of the three lease-purchase agreements; it then contacted Wagner Ink, through its president, Albert Wagner, to demand payment of the rental fees and the return of/payment for the tanks.   (Doc. 1, ¶¶ 22, 23; Doc. 17-1, ¶ 7.)   Precision further alleges that, in response, Wagner Ink and Albert Wagner stated that they had already sold the tanks "to third parties and had given the proceeds of the sale to their creditors."   (Doc. 1, ¶ 24.)

As to the named defendants, the complaint states causes of action for breach of contract (against Wagner Ink) and, as to both Wagner Ink and Albert Wagner, conversion, wantonness, unjust enrichment, and money had and received.

### III.        Personal Jurisdiction.

The named defendants assert that this Court lacks personal jurisdiction over them under either a traditional Due Process analysis or pursuant to the *Calder* "effects" test for intentional torts.   Precision asserts that the Court has personal jurisdiction over both defendants pursuant to the "effects" test and that the Court may assert jurisdiction over Wagner Ink under a traditional Due Process analysis.   Specifically, in the introduction to its response, Precision provides:

> This Court has specific personal jurisdiction over the defendants because both Wagner Ink and Albert Wagner engaged in intentional tortious conduct aimed at and with full knowledge that their conduct would cause

6

> injury to an Alabama resident.   The defendants' intentional tortious conduct alone is sufficient to establish specific jurisdiction over both defendants.
>
> Moreover, this Court has specific jurisdiction **over Wagner Ink** for the **additional reason** that Wagner Ink purposefully availed itself of the privilege of conducting business in Alabama and, therefore, has **sufficient minimum contacts** with Alabama to support the exercise of specific personal jurisdiction. . . .

(Doc. 17 at 2-3 (emphasis added); *see also id.* at 18 (Section I.B of Precision's argument is titled "Wagner Ink Has Sufficient Minimum Contacts with the State of Alabama.").)

Accordingly, based on Precision's position and the Court's independent review of the pleadings and the parties' briefing, the Court will examine whether Wagner Ink has sufficient minimum contacts with Alabama to support specific jurisdiction pursuant to a traditional Due Process analysis, and the Court will examine whether intentional torts allegedly committed by both defendants justifies specific jurisdiction over each named defendant.

### A.    General Structure.

Pursuant to that familiar analysis, a court may assert jurisdiction over a nonresident defendant, such as Wagner Ink, "only to the extent permitted by the long-arm statute of the forum State, and only if the exercise of jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment." *Vermeulen v. Renault, U.S.A. Inc.*, 975 F.2d 746, 753 (11th Cir. 1992), *opinion modified and superseded on other grounds*, 985 F.2d 1534 (11th Cir.), *cert. denied sub nom. Regie Nationale des Usines Renault S.A. v. Vermeulen*, 508 U.S. 907 (1993); *accord Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007).   But where (as is the case in Alabama) the courts of a forum State have interpreted the forum's long-arm statute to confer jurisdiction to the limits allowed by federal due process, *see, e.g., Mutual Serv. Ins. Co. v.*

*Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004) ("Alabama's long-arm statute authorizes Alabama courts to assert jurisdiction to the fullest extent constitutionally permissible."), state law need not be applied, and this Court "need only ask whether the exercise of jurisdiction over the nonresident defendant comports with due process." *Vermeulen*, 975 F.2d at 753; *see also DocRX, Inc. v. DOX Consulting, LLC*, 738 F. Supp. 2d 1234, 1244 (S.D. Ala. 2010) (collecting cases).

Due process requires both that a defendant have "certain minimum contacts" with the forum state, and if such minimum contacts exist, that the exercise of jurisdiction over a defendant "does not offend traditional notions of fair play and substantial justice." *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604 (1990) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In assessing a defendant's 'minimum' contacts with the forum state, courts have distinguished between contacts establishing 'specific' and 'general' jurisdiction." *Chatham Steel Corp. v. Brown*, 858 F. Supp. 1130, 1146 (N.D. Fla. 1994) (citations omitted). When a cause of action, such as this one,[5] is related to or arises out of a nonresident defendant's contacts with the forum, the Supreme Court has held that the "'relationship among the defendant, the forum and the litigation' is the essential foundation of *in personam jurisdiction*." *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

> Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint. It has long been recognized that a court has the minimum contacts to support specific jurisdiction only where the defendant purposely avails itself of the

---

[5] General jurisdiction, which derives from a defendant's contacts with the forum unrelated to the litigation, *see Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15 n.9 (1984), is not at issue here.

> privilege of conducting activities within the forum State, thus invoking the
> benefits and protections of its laws.   The requirement that there be
> minimum contacts is grounded in fairness.   It assures that the
> defendant's conduct and connection with the forum State [is] such that he
> should reasonably anticipate being haled into court there.

*Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000) (internal

citations and quotation marks omitted), *cert. denied*, 534 U.S. 827 (2001); *accord DocRX*,

738 F. Supp. 2d at 1245 ("The Eleventh Circuit has adopted a three-part standard to

determine whether the minimum contacts requirement has been met: 'First, the contacts

must be related to the plaintiff's cause of action.   Second, the contacts must involve

some act by which the defendant purposely avails itself of the privilege of conducting

activities within the forum[.]   Third, the defendant's contacts with the forum must be

such that the defendant should reasonably anticipate being haled into court there.'")

(quoting *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1220 (11th Cir. 1999) (citation

omitted; quotation modified)).

A court "is required to make an independent factual assessment of a defendant's

contacts with the forum when deciding whether it possesses jurisdiction over that

defendant . . . . Each case must be judged on its particular facts."   *LaSalle Bank*, 274 F.

Supp. 2d at 1297 (quoting *Mellon Bank (East) PSFS, Nat'l Assoc. v. Farino*, 960 F.2d 1217,

1224 (3d Cir. 1992) (citation omitted)); *see also Kulko v. California Super. Ct.*, 436 U.S. 84,

92 (1978) ("[T]he *International Shoe* 'minimum contacts' test is not susceptible to

mechanical application; rather, the facts of each case must be weighed to determine

whether the requisite 'affiliating circumstances' are present.") (citations omitted).

Further,

> [t]his Court must conduct its Due Process inquiry "as to each defendant
> separately, and for specific jurisdiction analysis, as to each claim
> separately."   *KVAR Energy Savings, Inc. v. Tri–State Energy Solutions*, LLP,

9

No. 6:08–cv–85–Orl–19KRS, 2009 WL 103645, *3 (M.D. Fla. Jan. 15, 2009); *see Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006) ("A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim."); *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 n.3 (11th Cir. 2006) ("We review personal jurisdiction as it relates to each defendant separately. . . . There is no issue in this case that Stubbs seeks to assert general, and not specific, jurisdiction over the Defendants.   This case involves only personal general jurisdiction and not specific personal jurisdiction."); *Berry v. Salter*, 179 F. Supp. 2d 1345, 1348 (M.D. Ala. 2001) ("These [Due Process] requirements must be met as to each defendant.").

*DocRX*, 738 F. Supp. 2d at 1245 (some citations modified).

### B.   Establishing Minimum Contacts pursuant to a Contractual Relationship (Wagner Ink).

"[A]n individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) (emphasis in original); *accord Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1268 (11th Cir. 2010) ("[A] forum seller's effort to sue a nonresident buyer in the seller's home forum for breach of contract [typically results in rejecting] jurisdiction when the buyer's *sole* contact with the forum is contracting with a resident seller who per-forms there.   This follows from the two well-established propositions that neither merely contracting with a forum resident nor the forum resident's unilateral acts can establish sufficient minimum contacts.") (emphasis in original) (citing *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1063 (11th Cir. 1986)); *Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 627-28 (11th Cir. 1994) (in stating that a contract with an out-of-state defendant cannot, by itself, create sufficient minimum contacts, the Eleventh Circuit noted that a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of

10

the business transaction.   The inquiry must instead focus on 'prior negotiations,' 'contemplated future consequences,' 'the terms of the contract and the parties' actual course of dealing.'") (citing *Burger King*, 471 at 478-79); *see also Rogers v. Omni Solution, Inc.*, No. 10–21588–CIV, 2010 WL 4136145, at *5 (S.D. Fla. Oct. 19, 2010) ("[W]hen a defendant literally has no contacts with a forum other than contracting with a forum's resident . . . , such a transaction does not provide sufficient minimum contacts to satisfy due process requirements.") (citing *Banton Indus. v. Dimatic Die & Tool Co.*, 801 F.2d 1283, 1284–85 (11th Cir. 1986) ("Nor does Dimatic actively seek business in Alabama. In fact, the contract and sale upon which Banton bases its claim arose out of Banton's unsolicited order of goods from Dimatic.")); *Diamond Crystal*, 593 F.3d at 1271 ("Other than merely accepting the order from the Alabama plaintiff, the transaction in *Banton* involved literally no contact with the proposed Alabama forum.") (internal citation removed).

But, "with respect to interstate contractual obligations, . . . parties who reach out beyond one state and *create continuing relationships and obligations* with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities."   *Burger King*, 471 U.S. at 473 (internal quotation marks and citations omitted; emphasis added); *accord Browning Enter., Inc. v. Rex Iron & Mach. Prods. Co., Inc.*, 504 F. Supp. 2d 1217, 1222 (N.D. Ala. 2007) ("Unlike the limited transactions involved in *Borg-Warner*, *Sloss* involved ten purchases over a period of several months, 'thereby establishing a course of dealing.'") (quoting *Sloss Indus.*, 488 F.3d at 933).

> [Accordingly,] when inspecting a contractual relationship for minimum
> contacts, [courts in this Circuit] follow a "highly realistic approach" that
> focuses on the substance of the transaction: prior negotiations,

contemplated future consequences, the terms of the contract, and the actual course of dealing.  *Burger King*, 471 U.S. at 479 (internal quotation omitted).  The focus must always be on the nonresident defendant's conduct, that is, whether the defendant deliberately engaged in significant activities within a state or created continuing obligations with residents of the forum.  *Id.* at 480. This focus ensures that a defendant will not be subject to jurisdiction based solely on " 'random,' 'fortuitous,' or 'attenuated' contacts."  *Id.* at 475 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).

*Diamond Crystal*, 593 F.3d at 1268 (internal citations modified); *see, e.g., Gencor Indus., Inc. v. Fort Myer Constr. Corp.*, No. 6:11–cv–1730–Orl–31DAB, 2012 WL 601190, at *4-5 (M.D. Fla. Feb. 23, 2012) (applying the *Diamond Crystal* framework to conclude, "Despite [Defendant] FMCC's characterization of itself as a 'passive purchaser,' several factors suggest otherwise; both the terms of the contracts and the contemplated future consequences of the transaction suggest that FMCC should reasonably anticipate defending suit in Florida.") (citing *Burger King*, 471 U.S. at 478).

Moreover, "[j]urisdiction is often found where further contacts or plus factors connect the defendant to the jurisdiction."  *Diamond Crystal*, 593 F.3d at 1268 (citing *Sloss Indus.*, 488 F.3d at 931-33).   While neither "plus" factors nor further contacts are "talismans[,] . . . the plus factors indicate that the defendant 'deliberate[ly] affiliat[ed]' with the forum, and thus should reasonably anticipate defending a suit there."  *Id.* at 1269 (quoting *Burger King*, 471 U.S. at 482).   The following (nonexclusive) "plus" factors were identified by the Eleventh Circuit in *Diamond Crystal*:

> [1] a defendant's initiating the contractual relationship, [2] visiting the plaintiff's factory to assess or improve quality, [3] sending materials to the plaintiff for inspection or use in shipping, [4] participating in the manufacturing process, [5] establishing a relationship by placing multiple orders, [6] requiring performance in the forum, [7] negotiating the contract via telefaxes or calls with the plaintiff; the list goes on.

*Id.* at 1268-69 (multiple footnotes with citations omitted); *see also Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 993-94 (11th Cir. 1986) (in a case "raising the often difficult question of what, beyond the bare contract, must be present to satisfy the 'minimum contacts' rule[,]" the Eleventh Circuit noted the following: "[a] meeting in the forum state may constitute purposeful availment if it involves significant negotiations of important terms"; "[a] direct solicitation by a foreign defendant of the business of a forum resident has been held to be purposeful availment in cases where either a continuing relationship or some in-forum performance on the part of the plaintiff was contemplated"; and a "clause choosing forum law to govern a continuing business relationship show[s] purposeful availment") (collecting cases) (citations, internal quotation marks, and footnote omitted); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1277 (10th Cir. 2005) (even a single agreement can evidence purposeful availment if fulfilling that agreement requires "a continuing relationship"); *Power Guardian, LLC v. Directional Energy Corp.*, ____ F. Supp. 2d ____, 2012 WL 4959427, at *5-6 (M.D. Ga. Oct. 17, 2012) ("It simply cannot be said, given the discussion prior to and surrounding the sale of the generators to the Plaintiff, that Directional Energy's contacts with Georgia were so cursory as to be random, fortuitous, or attenuated. Directional Energy intentionally and deliberately engaged the forum over a period of time for the purpose of entering a contractual relationship that would secure a sale here."); *Rogers*, 2010 WL 4136145, at *6 ("By negotiating a contract with a Florida resident, making the alleged misrepresentation about the quality of the exhaust system during the negotiations, shipping the goods to a dealer in Miami, and using Rogers as a reference for the exhaust system, Omni Solution's interactions with Rogers indicate that

it purposefully availed itself of the privilege of doing business in Florida.") (citing *Sloss Indus.*, 488 F.3d at 925).

Consistent with this authority, the Court must determine whether Wagner Ink's contacts with the State of Alabama related to Precision's lawsuit—based on the parties' contractual relationship, established when Wagner Ink contacted Precision, which resulted in three agreements over approximately two years for Wagner Ink's lease (and eventual purchase) of 29 tanks manufactured by Precision—are enough to say that Wagner Ink has "purposely avail[ed] itself of the privilege of conducting activities within the [State of Alabama], thus invoking the benefits and protections of [Alabama's] laws." *Consolidated Dev. Corp.*, 216 F.3d at 1291.   It has.

Wagner Ink's initial purchase of two tanks from Precision in January 2009 was not "a one-shot operation." *Sea Lift*, 792 F.2d at 994.   Instead, the actions Wagner Ink took, including initiating contact with Precision in Alabama in 2009 and subsequently soliciting further business from Precision—actions that ultimately caused the filing of this lawsuit—demonstrate that Wagner Ink "reach[ed] out beyond [New York to] create continuing relationships and obligations with [Precision, a] citizen of [Alabama,]" subject[ing itself] to regulation and sanctions in [Alabama] for the consequences of [its] activities." *Burger King*, 471 U.S. at 473.   Evidence of Wagner Ink deliberately affiliating with Alabama, demonstrating that it "should reasonably anticipate defending a suit [here,]" *Diamond Crystal*, 593 F.3d at 1269, include that:

1.  Wagner Ink directly solicited Precision to initiate the contractual relationship, *compare, e.g., Banton* (plaintiff placed one unsolicited order with defendant) (no purposeful availment), *with, e.g., Pro Axess* (defendant solicited plaintiff's assistance) (purposeful availment) *and Brannon v. Finance Am., LLC*, 483 F. Supp. 2d 1136, 1140–41 (M.D. Ala. 2007) (concluding that the minimum-contacts requirement was satisfied where defendants actively targeted the plaintiffs' business, as opposed to merely

14

making "an unfocused solicitation, such as an advertisement on a nationally oriented website");

2. Wagner Ink established a multi-year relationship by buying multiple tanks pursuant to three separate agreements, *compare, e.g., Banton* (one order), *Borg-Warner* (one order), *and Browning Enter.* (two to three purchases over ten days) (no personal availment), *with, e.g., Diamond Brands* (fourteen transactions in six months) *and Sloss Indus.* (ten purchases over several months) (personal availment);

3. the agreements between Wagner Ink and Precision all included clauses choosing Alabama's law to govern their continuing business relationship, *see, e.g., Gold Kist, Inc. v. Baskin-Robbins Ice Cream*, 623 F.2d 375, 381 n.4 (5th Cir. 1980) ("[T]he contract between Baskin-Robbins and Gold Kist contained a choice-of-law provision calling for the application of Georgia law. Such a provision is a purposeful availment of the benefits and protections of Georgia law, for it not only selects the Georgia rules of decision but also reposes trust in the legislature and courts of Georgia in wisely shaping the law during the entire period in which the contract is to be in force.").[6]

Moreover, the Court finds that Wagner Ink deliberately chose a contractual relationship with Precision that subjected Wagner Ink to a continuing relationship with an Alabama corporation. Wagner Ink could have chosen to purchase the tanks outright. But, instead, it chose to enter a 36-month lease-purchase agreement for the initial two tanks and then chose to enter into two separate 36-month lease-purchase agreements (for an additional 27 tanks), subjecting itself to 60-months of lease payments to an Alabama corporation.[7] *See, e.g., Hoag v. Sweetwater Int'l*, 857 F. Supp. 1420,

---

[6] The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981. *See id.* at 1209.

[7] The uncontested declaration of Precision's CFO provides that "[t]he vast majority of [its] business is lease or sales[,]" but "Wagner Ink specifically requested a lease-purchase agreement pursuant to which [it] would purchase the tanks from Precision at the expiration of the lease. . . . [T]o accommodate Wagner Ink, . . . Precision entered into a 36-month lease-purchase agreement[,]" which required Wagner Ink "to pay monthly rental fees to Precision in Fairhope[.]" (Doc. 17-1, ¶ 3 (emphasis removed); *see also* Doc. 1, ¶ 14 (all three contracts were lease-purchase agreement requiring monthly rental payments).)

1426-27 (D. Nev. 1994) ("[B]y executing lease and purchase agreements with Hoag, Sweetwater created continuing contractual relationships and obligations that were subject to the benefits and protections of Nevada law."); *cf. Davis v. Borges*, CIV.A. No. 88−0493P, 1989 WL 125314, at *3 (D.R.I. May 9, 1989) ("[D]efendant MBCC's association with the two Rhode Island dealerships as a creditor and assignee of automobile leases establishes a relationship that would involve continuous and systematic contacts with Rhode Island[,]" which shows that it "availed [itself] of the privileges of conducting activities within Rhode Island thus invoking the benefits and protections of its laws.") (citation and internal quotation marks omitted).

Accordingly, Defendant Wagner Ink's motion to dismiss for lack of personal jurisdiction is **DENIED**.

### C.   Establishing Minimum Contacts pursuant to the "Effects" Test (Wagner Ink and Albert Wagner).

The second count of Precision's complaint, for conversion,[8] is the sole intentional tort claim alleged against Wagner Ink and Albert Wagner.

> In cases involving intentional torts, the applicable "minimum contacts" test is the "effects" test set forth by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984).   *Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d at 1220 n.28 (11th Cir. 2009).   "Stated in its broadest construction, the effects test requires a showing that the defendant (1) committed an intentional tort (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated."   *Id.* (citations omitted); *see also Licciardello v. Lovelady*, 544 F.3d 1280, 1286 (11th Cir. 2008) ("In *Ziegler*[ *v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995)], the court noted that[ ] . . . '[i]n [a] tort case[ ] jurisdiction may attach if an out-of-forum defendant merely engages in conduct aimed at,

---

[8]      "Conversion is an intentional tort . . . The intent required is not necessarily a matter of conscious wrongdoing.   It is rather an intent to exercise a dominion or control over the goods [of the plaintiff] which is in fact inconsistent with the plaintiff's rights."   *Industrial Techs., Inc. v. Jacobs Bank*, 872 So. 2d 819, 826 (Ala. 2003) (quoting *Johnson v. Northpointe Apartments*, 744 So. 2d 899, 904 (Ala. 1999)).

and having effect in, the situs state.'   The court formulated the *Calder* test for personal jurisdiction as requiring a tort that was (1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." (internal citation omitted)).

.                              .                              .

> [J]urisdiction under *Calder* requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum. . . . [T]he *Calder* effects test ***can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant expressly aimed its tortious conduct at the forum***, and thereby made the forum the focal point of the tortious activity. Simply asserting that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement.   The defendant must manifest behavior intentionally targeted at and focused on the forum for *Calder* to be satisfied.   In the typical case, this will require some type of entry into the forum state by the defendant.

> *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265 (3rd Cir. 1998); *see Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1079 (10th Cir. 1995) ("Our review of [ ] post-*Calder* decisions indicates that the mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts.   Instead, in order to resolve the jurisdictional question, a court must undertake a particularized inquiry as to the extent to which the defendant has purposely availed itself of the benefits of the forum's laws."); *Ashton v. Florala Mem'l Hosp.*, Civ. Act. No. 2:06cv226-ID, 2006 WL 2864413, at *10 (M.D. Ala. 2006) ("Courts in other jurisdictions, and most recently the Supreme Court of Alabama, however, have recognized that 'most courts define the *Calder* test as requiring something more than mere awareness that one's intentional acts will cause harm in the forum state.'").

*DocRX*, 738 F. Supp. 2d at 1249-50 (emphasis added and some citations modified); *see*

*also Rhodes v. Unisys Corp.*, 170 Fed App'x 681, 684 (11th Cir. Mar. 14, 2006) (per curiam)

("The *Calder* effects test is a lens through which the connectivity between defendant,

cause of action, and forum state may be viewed[,] and, for example, an email (giving

17

rise to a tort cause of action) "not focused on causing injury in [the forum]" will not

trigger a *Calder* analysis.).[9]

The type of, and facts underlying the, intentional torts at issue in *Calder*, and in

the Eleventh Circuit's *Licciardello* decision are instructive to determine what types of

intentional torts can typically be classified as "aimed at [a] forum state"—

> In *Calder*, a libel action was brought in a California court against two
> Florida defendants, a writer and the editor of the National Enquirer
> Magazine.   The alleged libelous article was written and edited in Florida
> and published in the Florida-based national tabloid magazine.   Holding
> that the California court could exercise personal jurisdiction over the
> Florida defendants, the Court explained that the "focal point" of the
> article "concerned the California activities of a California resident," that
> the magazine's largest circulation was in California, and that the "brunt of
> the harm, in terms both of [the plaintiff's] emotional distress and the
> injury to her professional reputation," was endured by the plaintiff in
> California.   Jurisdiction, thus, was proper in California based on the
> "'effects'" of the defendants' Florida conduct in California. . . .

> In *Licciardello*, recognizing that "[m]any courts have employed the *Calder*
> 'effects' test when the plaintiff's claim involves an intentional tort," the
> Eleventh Circuit applied the effects test to determine personal jurisdiction
> over a non-resident defendant alleged to have committed trademark
> infringement . . . . [There, t]he Eleventh Circuit found the *Calder* effects test
> satisfied.   *Licciardello*, [further, involved] the use of the internet as the
> vehicle through which the intentional tort was accomplished.   [As, t]he
> Eleventh Circuit explained,

>> We hold only that where the internet is used as a vehicle for the
>> deliberate, intentional misappropriation of a specific individual's

---

[9]      *See also Brennan v. Roman Catholic Diocese of Syracuse N.Y., Inc.*, 322 Fed. App'x
852, 853, 856 (11th Cir. Apr. 9, 2009) (per curiam) (in which the Eleventh Circuit reversed a
district court's determination that the Syracuse Diocese did not avail itself to jurisdiction in
Florida by allegedly "intentionally inflicting emotional distress on [the plaintiff] by
're-victimizing' him" because the "diocese failed to pay for his out-of-pocket expenses in breach
of their" verbal agreement to pay for the plaintiff to attend counseling in Florida related to his
recall of "a memory, suppressed for nearly four decades, of his childhood rape in Syracuse,
New York, by a Roman Catholic priest. . . . Taking Brennan's allegations as true, we conclude
that the district court erred in finding that the diocese did not have sufficient minimum contacts
with Florida for purposes of Brennan's breach of contract and tort claims because the diocese
orally offered to pay for his treatment in Florida and *he felt all of his harm from the intentional
torts directed at him by the diocese in Florida*.") (emphasis added).

> trademarked name or likeness and that use is aimed at the
> victim's state of residence, the victim may hale the infringer into
> that state to obtain redress for the injury.   The victim need not
> travel to the state where the website was created or the infringer
> resides to obtain relief.

*Norment Sec. Group, Inc. v. Granger N. Inc.*, No. 2:08–CV–533–WKW, 2009 WL 458540, at

*12 & n.10 (M.D. Ala. Feb. 23, 2009) (in which conversion was also alleged) (quoting

*Licciardello*, 544 F.3d at 1288 n.8) (multiple other citations omitted); *see also Denny Mfg.*

*Co., Inc. v. Drops & Props, Inc.*, Civil Action No. 09-0214-KD-M, 2010 WL 119603, at *4

(S.D. Ala. Jan. 7, 2010) (relied on by Precision) (in which this Court found that

allegations that a defendant's president intentionally infringed the Alabama plaintiff's

intellectual property—"similar to those made against [the defendant in

*Licciardello*]"—satisfied the *Calder* effects test: "The Court finds that Plaintiff has met the

effects test of *Calder* by showing that Gupta engaged in intentional conduct which were

calculated to cause injury to Denny in Alabama.").

   As stated above, the sole intentional tort alleged in this lawsuit is the named

defendants' conversion of Precision's tanks, already sent by Precision from Alabama to

New York.   (*See* Doc. 1, ¶ 24.)   Thus, Precision has satisfied the first prong of *Calder* by

alleging an intentional tort.   *See, e.g., Oldfield*, 558 F.3d at 1220 n.8.   Precision has also

satisfied *Calder*'s third prong by alleging that the intentional conversion caused it harm

in Alabama, which—given the parties' contractual relationship—Wagner Ink and

Albert Wagner should have reasonably anticipated.   As to the second prong, whether

the defendants' alleged tortious conduct was "directly aimed at [Alabama]," *id.*,

Precision provides this summary:

> Precision has presented evidence establishing that Albert Wagner knew
> Precision was based in Alabama, induced Precision to send numerous
> tanks to New York, made misrepresentations regarding payments,

converted the tanks for his own and/or Wagner Ink's own gain, and knew that his actions would have a significant impact on Precision in Alabama. Such evidence demonstrates that Wagner Ink and Albert Wagner intentionally directed their tortious conduct (securing tanks under false pretenses and then converting those thanks for their own benefit) at Precision in Alabama. This Court, therefore, may properly exercise personal jurisdiction over both the corporation (Wagner Ink) and its president (Albert Wagner).

(Doc. 17 at 16-17.)

First, under Alabama law, "the 'act or omission' complained of in a conversion action takes place where the alleged wrongful taking or retention of ownership occurs[.]" *Ex parte Jim Walter Homes, Inc.*, 830 So. 2d 733, 736 (Ala. 2002) (characterizing the holding of *Ex parte Overstreet*, 748 So. 2d 194, 196-97 (Ala. 1999)).[10] Thus, the alleged conversion of Precision's tanks occurred in New York. Although Precision was harmed in Alabama by the alleged conversion of its tanks in New York, that, alone, does not show that the second prong of *Calder* effects test—requiring the tortious conduct be directed at the forum—is satisfied. *See, e.g., IMO Indus.*, 155 F.3d at 265 ("[J]urisdiction under *Calder* requires more than a finding that the harm caused by the defendant's intentional tort is primarily felt within the forum."); *Far West Capital*, 46 F.3d at 1079 ("[P]ost-*Calder* decisions [require more than] the mere allegation that an out-of-state defendant . . . has committed [a] business tort[ ] that [has] allegedly injured a forum resident[.]").

The majority of courts to examine whether conversion of a plaintiff's property outside the forum is enough to show that a defendant has "directly aimed [its tortious

---

[10]    There, the Alabama Supreme Court held the conversion of the insurance proceeds at issue there, released through a check cut in Atlanta, Georgia, which "was issued based on a claim of damage at a house located on real property in Fayette County[,]" Alabama occurred when the check was cashed in Tampa, Florida; thus, Fayette County was not a proper venue. *Id.*

conduct] at the forum," *Oldfield*, 558 F.3d at 1220 n.8, have concluded that it does not.

For example, in *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610 (1st Cir. 2001),

the First Circuit noted, "courts have struggled somewhat with *Calder*'s import.   As we

have previously noted, *Calder*'s 'effects' test was specifically designated for use in a

defamation case.   Thus, whether *Calder* was ever intended to apply to numerous other

torts, such as conversion or breach of contract, is unclear."   *Id.* at 624 (citing *IMO*

*Indus.*, 155 F.3d at 261 (noting that courts, in applying *Calder* to non-defamation cases,

have adopted "a mixture of broad and narrow interpretations") (other citations,

quotation marks, and footnote omitted).   The First Circuit went on,

> the facts of *Calder* diverge widely from the facts in this[, also a conversion
> and breach of contract,] case.   Although *Calder*'s significance is based on
> its 'effects' theory, in that case, the actual tort or injury, not just its
> consequences, occurred within the forum. *Compare Keeton v. Hustler*
> *Magazine*, 465 U.S. 770, 776-77 (1984) (tort of libel is generally held to occur
> wherever the libelous material is circulated), *with Swiss II*, 191 F.3d 30, 37
> (1st Cir. 1999) (legal injury of conversion occurs where conversion takes
> place).   Moreover, the in-forum publication of the article in *Calder*
> provided an important contact for jurisdictional purposes; a contact that is
> absent in this case, since any tortious conversion or breach of contract
> occurred in Antigua.

*Id.* at 624-25 (internal citations modified).   Significantly, although a member of the

panel, Judge Lipez, criticized the majority's "formulistic distinctions" in his dissent, he

conceded,

> That is not to say that the situs of the plaintiff's injury is irrelevant to the
> jurisdictional analysis.   In cases where the injury occurred outside the
> forum, the plaintiff may find it difficult to satisfy the second prong of the
> *Calder* test, which requires a showing that the defendant's act was
> 'calculated' to cause the harmful effects in the forum.   That inquiry is
> designed to determine whether the nature of the effects is such that
> jurisdiction reasonably can be based on them alone, and it is here that the
> government's *prima facie* case for jurisdiction falters. The government
> argues that '[Swiss American Bank (or SAB)] knew that its intentional
> conduct in Antigua would cause injury to the United States government.'

That is not enough. The government must show that SAB's actions were 'expressly aimed' at the United States as a forum.

*Id.* at 633-34 (Lipez, J., dissenting) (citing *Calder*, 465 U.S. at 789 (distinguishing the case of the negligent welder); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212 (5th Cir. 1999) ("Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum."); *Burger King*, 471 U.S. at 474, ("Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish [minimum] contacts there . . . , the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction." (footnote omitted) (quoting *World-Wide Volkswagen*, 444 U.S. at 295))); *accord Norment*, 2009 WL 458540, at *15 ("Moreover, at least one circuit court of appeals has distinguished the facts of *Calder* on a ground salient to this case.   *Calder* involved a libel claim, and, thus, the actual tort or injury, not just its consequences, occurred within the forum.   In *Swiss American Bank*, as here, the acts providing the predicate for the alleged tortious conversion and breach of contract happened in the foreign jurisdiction, not in the forum state.   In sum, on this record, the court finds that as to each Defendant, Norment has offered only allegations and evidence of an in-forum adverse effect felt by Norment as a result of the alleged intentional conduct of Defendants. Accordingly, the court rejects Norment's argument that constitutionally sufficient contacts are satisfied based on the *Calder* effects test.") (internal citations omitted); *see also Viracon, Inc. v. J & L Curtain Wall LLC*, ___ F. Supp. 2d ____, 2013 WL 885465, at *5-6 (D. Minn. Mar. 8, 2013) (also rejecting the plaintiff's attempt to invoke *Calder* as to its claims for conversion: "while *Calder* has been described as an 'effects' test, more than mere effects supported that holding.   To invoke *Calder*, a plaintiff must show the

defendant's acts were performed for the very purpose of having their consequences felt in the forum state.   In other words, the challenged conduct must be uniquely aimed at the forum state, which requires more than knowledge that a [forum] company will suffer consequences from the conduct.   This is all Viracon has proffered here.") (multiple citations and internal quotation marks omitted); *Power Beverage LLC v. Side Pocket Foods Co.*, C/A No. 06:12–931–TMC, 2013 WL 227875, at *6 (D.S.C. Jan. 22, 2013) ("Here, the first element of the 'effects test' is satisfied because fraud and conversion are intentional torts.   However, the conversion claim cannot meet the second element because the legal injury occasioned by the tort of conversion is deemed to occur where the actual conversion takes place.   And by Power Beverages' own allegations, the vodka product and funds were converted in Oregon, not South Carolina.   Moreover, as to the last prong of the test, the court concludes that South Carolina was is not the focal point of the alleged tortious activity.   While Side Pocket knew Power Beverages was a South Carolina corporation, Side Pocket did not expressly aim its alleged tortious actions at South Carolina.   Based on the foregoing, Power Beverages has not shown that Side Pocket expressly targeted South Carolina.") (multiple citations and internal quotation marks omitted); *but see Flagship Interval Owner's Ass'n, Inc. v. Philadelphia Furniture Mfg. Co.*, Civil No. 09–1173 (JBS/JS), 2010 WL 1135736 (D.N.J. Mar. 22, 2010) (exercising jurisdiction over the plaintiff's claim for conversion because "Plaintiff has felt the harm in New Jersey and Artone and Philadelphia Furniture expressly aimed their allegedly tortious conduct at New Jersey, by sending their solicitation for the deposit to New Jersey and refusing to return the money to New Jersey.") (citing *IMO Indus.*, 155 F.3d at 256); *Dahon N. Am., Inc. v. Hon*, No. 2:11–cv–05835–ODW (JCGx), 2012 WL 1413681, at *5 (C.D. Cal. Apr. 24, 2012) ("Mobility asserts that unlike *Calder*,

23

Mobility's alleged conversion was not expressly aimed at California because any effect in California was insignificant.   The Court disagrees. . . . Mobility neglects the primary effect of its intentional act—that is, Mobility's conversion of the BIOLOGIC mark deprived DNA, a California corporation, of its intellectual property. . . . [T]he Court finds that Mobility's alleged possession of DNA's converted property establishes that Mobility's conduct was expressly aimed towards a California company, and therefore, towards California.").

This Court cannot say that the defendants' alleged conversion of Precision's tanks was directly aimed at Alabama.   The alleged conversion of property in this case is not the same as other cases involving intentional business torts, like *Licciardello* and *Denny*, where it is alleged that a defendant intentionally misused a plaintiff's identity, thus attacking the plaintiff directly where the plaintiff is domiciled.   In this regard, the discussion in *HME Providers, Inc. v. Heinrich*, No. 6:09-cv-2186-Orl-31GJK, 2010 WL 557106 (M.D. Fla. Feb. 11, 2010), is instructive:

> The Plaintiffs also assert that, in *Licciardello* and other cases, the Eleventh Circuit has held that allegations that the defendant committed intentional torts may support the exercise of personal jurisdiction, even where the defendant has no other contacts with the forum.   However, *Licciardello* and other cases espousing this principle require that the intentional tort be "expressly aimed at the plaintiff in the forum state."   This principle has been held to establish sufficient minimum contacts in cases alleging trademark infringement, such as *Licciardello*, and libel, such as *Calder v. Jones*.   But misuse of a trademarked name and libel target a plaintiff in a way that the torts alleged here do not.   ***The misappropriation and conversion at issue here consist of allegations that these defendants wrongfully used or exercised dominion over the plaintiffs' intellectual property and trade secrets, rather than an attack on the Plaintiffs directly. The Plaintiffs claim to have suffered lost sales, not harm to their reputation.***   Because the torts alleged to have been committed by Healthpia Kentucky and Genesis Health were not "expressly aimed at" the plaintiffs the way that the torts in *Licciardello* and *Calder* were, the minimum contacts requirement has not been met.

24

*Id.* at *4 (emphasis added).[11]

Having already determined the corporate defendant, Wagner Ink, has established minimum contacts with Alabama pursuant to its business relationship with Precision, purposefully availing itself of the privilege of conducting activities in Alabama such that Wagner Ink should reasonably anticipate defending a lawsuit here (*see supra*, § III.B), the Court now concludes, because it has not been shown that the alleged intentional tort (allegedly committed by both defendants) was directed at Alabama, the individual defendant, Albert Wagner, lacks sufficient minimum contacts with Alabama.  Thus, "[b]ecause [Albert Wagner] did not purposefully direct [his] activities at the forum state, [his] contacts are not 'such that [he] could reasonably anticipate being haled into court [in Alabama].'"  *Norment*, 2009 WL 458540, at *15 (quoting *Vermeulen*, 985 F.2d at 1546).  Accordingly, Defendant Albert Wagner's motion to dismiss for lack of personal jurisdiction is **GRANTED**.

### D.    Fair Play and Substantial Justice (Wagner Ink).

Having determined that Wagner Ink possesses the requisite minimum contacts in Alabama does not conclude the personal jurisdiction analysis.  *See, e.g., Professional Locate & Recovery, Inc. v. Prime, Inc.*, Civil Action No. 07-0175-WS-C, 2007 WL 2333218, *8 (S.D. Ala. Aug. 15, 2007) ("Of course, a finding of minimum contacts does not

---

[11]    Precision also attempts to use this Court's decision in *David's Auto Shredding, Inc. v. Shredder Co., LLC*, Civil Action No. 08–00410–KD–B, 2009 WL 8478359 (S.D. Ala. Mar. 24, 2009), *report & recommendation adopted*, 2011 WL 4915155 (S.D. Ala. Oct. 17, 2011), to support its position that the defendants' alleged conversion was aimed at Alabama.  There, however, Magistrate Judge Bivins found *Calder* satisfied in important part because the individual defendant, domiciled in Texas, allegedly "made repeated misrepresentations regarding the status of equipment . . . *[he] knew was to be used at Plaintiff's facility in Alabama*" in addition to converting funds paid by the plaintiff for the equipment.  *Id.* at *6 (emphasis added).  Thus, the plaintiff sufficiently alleged that the individual defendant's actions were directed towards doing harm to the defendant in Alabama.

conclude the personal jurisdiction analysis in and of itself; rather, personal jurisdiction

can only be exercised over one having minimum contacts with the forum if doing so

would not offend traditional notions of fair play and substantial justice.").

> "In determining whether jurisdiction comports with traditional notions of fair play and substantial justice, the court looks at: (a) 'the burden on the defendant,' (b) 'the forum State's interest in adjudicating the dispute,' (c) 'the plaintiff's interest in obtaining convenient and effective relief,' (d) 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and (e) 'the shared interest of the several States in furthering substantive social policies.'" *McGow v. McCurry*, 412 F.3d 1207, 1216 (11th Cir. 2005) (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1276 (11th Cir. 2002)); *see Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.*, 207 F.3d 1351, 1358 (11th Cir. 2000) ("Once it is decided that defendants have at least minimum contacts with a forum, the burden is on the defendants to show that the imposition of jurisdiction in the forum is unreasonable.  Several factors are relevant to this showing: (1) the defendant's burden; (2) the forum state's interest; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies.").

*DocRX*, 738 F. Supp. 2d at 1253-1254 (internal citations modified).

Wagner Ink simply has not shown "the requisite 'compelling case' that

exercising jurisdiction would be unconstitutionally unfair." *Diamond Crystal*, 593 F.3d

at 1274 (quoting *Burger King*, 471 U.S. at 477).   Wagner Ink contends that litigating this

matter in Alabama would be burdensome and that some witnesses, as well as Wagner

Ink's documents and the allegedly converted tanks, are located outside of Alabama, but

such contentions do not amount to unconstitutional unfairness.   While "[i]t is clear to

the Court that [Wagner Ink] will feel some burden by having to come to Alabama to

defend [Precision's] suit, that burden will not be significant given the availability of

modern transportation and communication." *DocRX*, 738 F. Supp. 2d at 1254

(collecting cases).   It is clear, moreover, that Alabama has "an important interest in

providing a forum in which [her] residents can seek redress for injuries caused by

out-of-state actors[,]" *Andersen v. Sportmart, Inc.*, 57 F. Supp. 2d 651, 662 (N.D. Ind. 1999), especially where, as here, "the injury to plaintiff occurred in Alabama as a result of [Wagner Ink's] contacts with Alabama[,]" *DocRX*, 738 F. Supp. 2d at 1254 (citation omitted).

Accordingly, jurisdiction over Wagner Ink "comports with traditional notions of fair play and substantial justice[.]"   *McGow*, 412 F.3d at 1216.

## IV.      Transfer of Venue.

The resolution of the defendants' motion to dismiss, with Wagner Ink remaining a party to this lawsuit, leads the Court to consider Wagner Ink's alternative request that this matter be transferred to Eastern District of York, which Wagner Ink asserts is a more convenient forum.

"District courts have broad discretion in deciding whether to transfer an action to a more convenient forum."   *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1307 (N.D. Ala. 2003) (citation omitted); *see also England v. ITT Thompson Industries, Inc.*, 856 F.2d 1518, 1520 (11th Cir. 1988) ("Trial judges are permitted broad discretion in weighing the conflicting arguments as to venue" under § 1404(a)).   As a general matter, "[t]he burden is on the moving party to prove that a case should be transferred." *Irwin v. Zila, Inc.*, 168 F. Supp. 2d 1294, 1296 (M.D. Ala. 2001); *see also In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989) ("in the usual motion for transfer under section 1404(a), the burden is on the movant to establish that the suggested forum is more convenient"); *Holmes v. Freightliner, LLC*, 237 F. Supp. 2d 690, 692–93 (M.D. Ala. 2002) (observing that, under § 1404(a) analysis, defendant bears burden of demonstrating that suggested forum is more convenient than plaintiff's selected forum).

The relevant federal statute governing [transfer] reads as follows: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."   28 U.S.C. § 1404(a).   Motions to transfer pursuant to § 1404(a) are subject to a two-step analysis that examines, first, whether the action could originally have been brought in the proposed transferee forum, and second, whether a balancing of the convenience of the parties and the interest of justice favors transfer in the specific case. *See, e.g., LaSalle Bank N.A. v. Mobile Hotel Properties, LLC*, 274 F. Supp. 2d 1293, 1301 (S.D. Ala. 2003); *C.M.B. Foods, Inc. v. Corral of Middle Georgia*,

396 F. Supp. 2d 1283, 1286 (M.D. Ala. 2005); *Irwin*, 168 F. Supp. 2d at 1296. If the second step is reached, a court examining whether the balance of justice and convenience favors transfer considers a broad range of factors, including "(1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005). Examination of these factors must not be performed mechanically or by rote; rather, what is required is "individualized case-by-case consideration of convenience and fairness." *Irwin*, 168 F. Supp. 2d at 1296; *see also A.J. Taft*, 291 F. Supp. 2d at 1307 ("The decision of whether a case should be transferred under § 1404(a) is an individualized case-by-case consideration of convenience and fairness.") (citations omitted); *LaSalle Bank*, 274 F.Supp.2d at 1301 (similar).

*First Fin. Bank v. CS Assets*, LLC, Civil Action No. 08–0731–WS–M, 2009 WL 1211360, at *2 (S.D. Ala. May 4, 2009) (footnote omitted).

All Wagner Ink has shown is that the transfer of this matter to the Eastern District of New York would be more convenient for Wagner Ink; thus, it has not shouldered its burden to prove that this case should be transferred. *See, e.g., Pet Friendly, Inc. v. Catapult Group, L.L.C.*, No. 06-0642-C, 2006 WL 3690737, at *2 (S.D. Ala. Dec. 12, 2006).[12]   Accordingly, the alternative motion to transfer venue is **DENIED**.

---

[12]   The undersigned's analysis in that matter appears equally applicable to this action.   There, the Court noted,

> The defendants in this case have not satisfied their burden of establishing that this case represents one of those rare situations warranting the disturbance of plaintiff's choice of forum.   The convenience of the parties amounts to a wash in this case since it is certainly more convenient for the plaintiff, whose principal place of business is in Fairhope, Alabama, to pursue this lawsuit in this Court, whereas it is more convenient for defendants to defend the action in the Northern District of Texas, where the defendants reside and where the contract at issue was drafted and executed by defendant Peterson for Catapult.   There is no indication from the defendants that they have witnesses that will be unavailable for trial in this Court, and while those witnesses may possibly be outside the subpoena power of this Court, those problems would persist in

28

## V.        Conclusion.

Having determined that this case shall proceed against Defendant Wagner Ink in this Court, the parties are **ORDERED** to meet and confer and file no later than **May 3, 2013** a report of the parties' planning meeting pursuant to Rule 26(f).

**DONE and ORDERED** this the 19th day of April, 2013.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

Texas, with respect to witnesses located in Alabama (of which there are undoubtedly several given that the main principals and employees of plaintiff reside in the Southern District of Alabama).   Given the ability to move documents with relative ease in today's world, the location of documents (and other sources of proof) factor certainly does not weigh in favor of transfer to the Eastern District of Texas.   In addition, while the defendants make the allegation that it would be more cost effective and efficient for counsel of the parties in the Texas action to handle both actions, this does not take into consideration that it would add that much more to the expense of plaintiff's Alabama counsel in this case to handle this case in Texas.   Finally, there has been presented nothing to suggest that the trial efficiency and expense to justice system factor weighs in favor of transfer, particularly since this Court stands ready to give both parties a full and fair hearing in an expeditious manner.   All a transfer would do in this case is shift inconvenience from the defendants to the plaintiff and therefore, this Court must necessarily favor plaintiff's choice of forum by denying the defendants' motion to transfer venue to the Eastern District of Texas.

*Id.* (citations omitted).

29